MOYES SELLERS & HENDRICKS
Cody J. Jess (025066)
Scott Goldberg (015082)
1850 North Central Avenue, Suite 1100
Phoenix, Arizona 85004
Telephone: (602) 604-2141
cjess@law-msh.com
sgoldberg@law-msh.com

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frenchans, LLC, an Arizona limited liability company; Your Tax Coach, LLC, an Arizona limited liability company; Matthew French and Barbara Schreihans, husband and wife, | Case No. |
| Plaintiffs, | **COMPLAINT** |
| vs. | |
| Vestige, LLC, a Florida limited liability company; Johnny Dominguez a/k/a JD Rex and Jane Doe Dominguez, husband and wife, | |
| Defendants. | |

Frenchans, LLC ("Frenchans"), Your Tax Coach, LLC ("YTC" and with Frenchans the "Business Plaintiffs"), Matthew French ("French"), and Barbara Schreihans ("Schreihans" and with French, the "Individual Plaintiffs" and with the Business Plaintiffs, collectively "Plaintiffs") hereby assert the following claims against Defendants Vestige, LLC ("Vestige"), Johnny Dominguez a/k/a JD Rex ("Dominguez") and Jane Doe Dominguez (with Vestige, collectively "Defendants").

## <u>INTRODUCTION</u>

1.      The Individual Plaintiffs, who are located in Arizona, were inadvertently caught up in the fraudulent scheme Dominguez was operating out of Florida. Together, the Individual Plaintiffs lost hundreds of thousands of dollars in Dominguez's scheme, which promised investors

00300169 16

great wealth through passive income generated through e-commerce sales of consumer products Dominguez said he would select using proprietary algorithms to predict and capitalize upon consumer demand and trends.

2. Believing that Dominguez had found a profitable niche in the e-commerce market, the Individual Defendants encouraged friends, business colleagues, and clients to make the same investments they did in Dominguez's e-commerce scheme. Ultimately, through their own individual and collective efforts and experiences, the Individual Plaintiffs uncovered that Dominguez had been operating a fraudulent scheme on account of which the Individual Plaintiffs, their friends, business colleagues, and clients were duped out of several million dollars. The Individual Plaintiffs are filing this Complaint to make themselves whole, but more importantly, are filing this Complaint to make their friends, business colleagues, and clients whole, and to hold Dominguez accountable for his fraudulent conduct.

## PARTIES, JURISDICTION, AND VENUE

3. Frenchans is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona.

4. YTC is an Arizona limited liability company with its principal place of business in Maricopa County, Arizona.

5. The Individual Plaintiffs are husband and wife and are residents of Maricopa County, Arizona.

6. The Individual Plaintiffs are the sole members of Frenchans, which they formed to do business with Defendants.

7. Schreihans is the sole owner of YTC, which performs certain tax-related services.

8. On information and belief, Vestige is a Florida limited liability company with its principal place of business in Broward County, Florida.

9. Upon information and belief, Dominguez and Jane Doe Dominguez are husband and wife and are residents of Broward County, Florida.

10.    All acts alleged herein to have been taken by either Dominguez or Jane Doe Dominguez were for the benefit of the Dominguez marital community.

11.    Upon information and belief, Dominguez is the controlling owner, member, manager, officer, and principal of Vestige.

12.    This Court has subject matter jurisdiction over this case because the adverse parties are of complete diverse citizenship and the amount in controversy exceeds $75,000.

13.    This Court has personal jurisdiction over Defendants because they caused events to occur within the State of Arizona out of which this action arises. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the transactions and events that are the subject of this suit occurred in this district.

14.    The events described below occurred between August 2020 and November 2021 (the "Subject Period").

## **GENERAL ALLEGATIONS**

15.     Defendants represented to Plaintiffs that Vestige was in the business of opening and managing digital retail stores ("Digital Stores") on internet based platforms.

16.    Defendants represented to Plaintiffs that Vestige managed and operated Digital Stores on platforms owned and operated by Amazon and Walmart.

17.    Defendants represented to Plaintiffs that they had expertise in managing and operating Digital Stores according to the policies, terms, and conditions established by Amazon and Walmart (the "Policies").

18.    Defendants represented to Plaintiffs that they had a special expertise in developing algorithms ensuring that the Digital Stores managed by Vestige would operate profitably.

19.    Defendants represented to Plaintiffs that Vestige was a business management company that managed Digital Stores by procuring inventory, managing sales and returns, and performing related monetary functions.

20.     Defendants represented to Plaintiffs that Vestige provides

investors with a highly lucrative, passive stream of income that requires no effort, time, or energy on your side. Vestige does this by leveraging Amazon's platform in order to sell to the tens of millions of customers who use the platform to shop online every year.

*Available at* https://vestige.llc/, *About Us* (last visited Feb. 1, 2022).

21.     Defendants represented to Plaintiffs that Vestige generates "consistent 12 – 30% ROI" through a "team of knowledgeable e-commerce experts [who] will set-up, stock, manage, and grow your amazon store(s) while you sit back and collect the profits." *Available at* https://vestige.llc/, *Amazon Automation* (last visited Feb. 1, 2022).

22.     Defendants represented to Plaintiffs that

We provide our clients with an aged Amazon store(s) and access to our proprietary algorithm to maximize their stores selling potential. The best part about our stores? .. there is no inventory cost involved! We do not keep inventory on hand <u>ever</u>. We manage all daily operations for our clients [sic] stores so that there is no work involved for them. We have designated teams for onboarding, inventory management (adding and removing listings from the store), and customer service. Vestige LLC, the Amazon automation company that will turn your Amazon store into an automated money-making machine.

*Available at* https://vestige.llc/, *Welcome to Vestige LLC* (last visited Feb. 1, 2022) (emphasis in original).

23.     Defendants represented to Plaintiffs that Vestige had "10 Years of Consistent ROI for Clients." *Available at* https://vestige.llc/, *Generate 12-30% ROI Monthly Without Having to Lift a Finger* (last visited Feb. 1, 2022).

24.     The owners of the Digital Stores are private individuals and entities ("Store Owners") who enter into management contracts with Vestige. Store Owners are Vestige's clients. The management contracts between Vestige and Store Owners are titled as "Amazon E-Commerce Consulting Contract" ("Management Contracts"), an exemplar of which is attached hereto as **Exhibit 1**.

25.     Under the Management Contracts, the client is the Digital Store's owner and Vestige

is the Digital Store's manager. Under the Management Contracts, Store Owners delegate full managerial and operational authority over their Digital Stores to Vestige, while the Store Owners are to receive passive income from the Digital Stores' profits.

26.     Pursuant to the Management Contracts, Vestige is responsible for operating the Digital Stores in accordance with the Policies of Amazon and Walmart, and for reporting all business related activity of the Digital Stores to Store Owners.

27.     As described in the Management Contracts, in exchange for managing and operating the Digital Stores, Store Owners are required to make certain management fee payments to Vestige.

28.     Pursuant to the Management Contracts, Store Owners are required to pay an initial, one-time fee to Vestige ("Initial Fee"). The Initial Fee paid to Vestige in 2020 was $35,000, and was increased in 2021 to $37,000. The Initial Fee was charged on a per Digital Store basis, *e.g.*, two Digital Stores would require an Initial Fee payment of $70,000 – $74,000.

29.     Pursuant to the Management Contracts, Store Owners also agreed to pay Vestige a sales commission equal to fifty percent (50%) of the Digital Stores' profits after Store Owners had recouped their Initial Fee.

30.     In August 2020, Schreihans was introduced to Defendants through a client of YTC. Prior to August 2020, Plaintiffs had no dealings with Defendants and had never heard of them.

31.     In mid-August 2020, Schreihans had a telephone call with Dominguez. During that telephone call Dominguez represented to Schreihans that he and an unidentified Store Owner had become wealthy using an e-commerce algorithm Dominguez had developed to sell products on the Amazon and Walmart platforms.

32.     According to Dominguez, he developed a proprietary algorithm that could predict consumer demands and trends for certain products, which would allow Store Owners to get ahead of and anticipate the demand curve. In this regard, Store Owners would not be required to maintain inventory and could be assured of high demand for their products.

33.     Likewise, according to Dominguez, the algorithm also predicted when demand for a product was waning, giving Store Owners advance knowledge of when to switch from selling one product to another product whose demand was higher and growing. In summary, Dominguez claimed that his proprietary algorithm could predict the life cycle or demand cycle for hundreds of products, which would increase profits while reducing risks to Store Owners.

34.     Based upon Dominguez's representations as described above, on August 27, 2020, Schreihans wired a $35,000 Initial Fee to Vestige in exchange for Vestige's agreement to open and manage a Digital Store on the Amazon platform for Schreihans. In essence, by paying the Initial Fee in August 2020, Schreihans had "purchased" a Digital Store from Vestige.

35.     In late September 2020, Dominguez sent information to Schreihans indicating that Vestige had opened her Amazon store and that it had earned $2,700 in sales. Upon information and belief, Dominguez's report of sales to Schreihans was intended to lure Schreihans into sending more money to Dominguez and to give Plaintiffs unjustified confidence in the legitimacy of Defendants' operations.

36.     In late September 2020, Dominguez told Schreihans that opening four Walmart digital stores would yield profits to Schreihans of $500,000 per year. Dominguez told Schreihans that he would open the four Walmart stores for Schreihans to own and for Vestige to manage at an initial cost of $20,000.

37.     In total, Plaintiffs paid Defendants $182,000 to set up seven digital stores for Plaintiffs to own and for Vestige, thorough Dominguez, to manage (collectively, the "Schreihans Stores").

38.     During September and October 2020, Plaintiffs were not able to confirm that the Digital Stores Vestige had allegedly opened for them were producing sales revenue. Dominguez explained that computer glitches were causing sales interruptions and reporting issues, but continued to assure Plaintiffs that the problems were temporary and that they soon would be receiving substantial passive income payments.

39.     While the Schreihans Stores were eventually opened and generated some positive income, that income was being withheld by Amazon for a number of reasons Dominguez promised Plaintiffs he would cure, but never did.

40.     In fact, in or around January 2021, and unbeknownst Plaintiffs at the time, Amazon had changed its shipping policy, thereby rendering the Digital Stores obsolete. As a result, the performance of the Schreihans Stores suffered and the Schreihans Stores ultimately became unfeasible.

41.     To sell its Digital Stores and to generate more management income, Vestige utilized Store Owners and other third parties to recruit potential Store Owners as clients ("Referral Sources").

42.     Vestige agreed to pay commissions to its Referral Sources for each referral that opened a Digital Store for Vestige to manage. The agreement between Vestige and its Referral Sources was titled as Profit Sharing/Referral Agreement ("Referral Contract"). A copy of the Referral Contract is attached hereto as **Exhibit 2**.

43.     In or about October 2020, Dominguez asked the Individual Plaintiffs to act as Referral Sources, which they could do by informing their friends, business colleagues, and clients about Vestige's e-commerce business and its ability to generate passive income.

44.     In addition to benefitting the clients of the Business Plaintiffs, Dominguez represented to Plaintiffs that Vestige would pay a referral fee to the Business Plaintiffs for each their referrals that paid an Initial Fee to own a Digital Store for Vestige to manage. Thus, in November 2020, Plaintiffs believed that they, their friends, business colleagues, and clients could jointly profit by taking advantage of Vestige's e-commerce system and Dominguez's algorithms.

45.     In October 2020, Plaintiffs believed that becoming a Store Owner or an owner of many digital stores was a near certain way of generating passive income with minimal risk, wanted to take advantage of that opportunity while it lasted, and also desired to share that opportunity with their friends, business colleagues, and clients, who were also seeking investment

opportunities that could pay a reasonable rate of return compared with the low return investments that were prevalent at the time.

46.     In November 2020, Dominguez represented to Schreihans that she could make ten percent (10%) residual sales commissions by referring potential Store Owners, aka clients, to Vestige. Dominguez later changed the ten percent (10%) commission rate to seven percent (7%), and then to five percent (5%).

47.     Dominguez also represented that Vestige would manage and operate the Digital Stores for the Business Plaintiffs' referrals as it agreed to do for Plaintiffs under the Management Contracts between Vestige and Plaintiffs (the "Schreihans Contracts").

48.     Because of their desire to generate passive income for themselves and their friends, business colleagues, and clients, the Business Plaintiffs agreed to become Referral Sources.

49.     Frenchans and YTC had begun making referrals to Vestige and Dominguez in November 2020, although their Referral Contract with Vestige was not signed until April 2021.

50.     On November 20, 2020, YTC made its first referral to Vestige. On November 20, 2020, Schreihans, on YTC's behalf, collected the Initial Fee payment from the referral, which she then promptly passed through via wire transfer to Defendants.

51.     The pattern of collecting the Initial Fee from the referral and then passing through the Initial Fee to Defendants occurred numerous times throughout the Subject Period (the "Pass Through Payments").

52.     The persons the Business Plaintiffs referred to Vestige desired to enter into a contract to memorialize their payment of the Initial Fee and the Digital Store management services they would receive in exchange for the Initial Fee.

53.     Instead of having the referrals contract directly with Vestige, Dominguez instructed Plaintiffs to have the Business Plaintiffs contract with the referrals.

54.     To provide their referrals with a contract, the Business Plaintiffs copied the Management Contract that Vestige had supplied to them (the "Sub-Management Contract").

55.     In December 2020, Dominguez told Schreihans that he was opening between five and eight Digital Stores per day on the Amazon and Walmart platforms, that these Digital Stores were creating large management fees and commissions for Vestige, and substantial profits of passive income for the Store Owners.

56.     In December 2020, Dominguez began sending leads for Schreihans to cultivate, develop, and then refer to Vestige. In addition to the leads Dominguez was providing, the Business Plaintiffs continued to make referrals to Vestige, to collect Initial Fee payments, and to make the Pass Through Payments to Vestige and Dominguez.

57.     Few, if any, of the Business Plaintiffs' referrals entered into direct contracts with Vestige. Instead, the referrals entered into the Sub Management Contracts with YTC or Frenchans with the understanding that Vestige would be responsible for managing and operating the Digital Stores. At the time, Plaintiffs trusted Dominguez and believed that he would generate substantial income for them and for their referrals, many of whom were friends and clients of Plaintiffs.

58.     In December 2020, Dominguez told Schreihans that he was developing a "new algorithm" that would increase the profits of the Schreihans Stores and the Digital Stores for the Business Plaintiffs' existing and future referrals.

59.     In December 2020, Vestige was failing to report sales data and blamed the problems on excess demand for Vestige's services and logistical and software glitches. Dominguez again reassured Plaintiffs that the glitches were temporary and would not impact the passive income they should expect to receive.

60.     Despite logistical and software issues, in December 2020, Dominguez told Plaintiffs that he was making so much money he intended to purchase a helicopter and that the Digital Stores Vestige was managing had $30 million in sales.

61.     In February 2021, the Individual Plaintiffs traveled to West Palm Beach, Florida to meet Dominguez for the first time.

62.     An important purpose of the February 2021 meeting was to fix the logistical,

operational, and reporting problems Plaintiffs were experiencing and that Dominguez had blamed on the overwhelming demand for Vestige's services and computer glitches.

63.     At a lavish dinner party held on or about February 13, 2021, Dominguez introduced the Individual Plaintiffs to third parties that had purportedly become wealthy by owning Digital Stores that Vestige was managing. As the dinner party ended, Dominguez gave French the keys to his Ferrari 488 sports car to drive.

64.     On February 14, 2021, the Individual Plaintiffs met with Dominguez on a luxury boat Dominguez claimed to own. While on the boat, Dominguez represented to the Individual Plaintiffs that Vestige was managing 800 Digital Stores, that these stores had produced $30 million in sales, and that as a result, Dominguez was able to purchase between 25 and 30 luxury vehicles. Dominguez also claimed to be wearing a watch he had purchased for $900,000.

65.     Dominguez presently purports to own multiple luxury automobiles, including Ferraris, Lamborghinis, Bentleys, and Rolls Royces ("Entrepreneur JD Rex reveals his secrets to success in business," *available at* https://digitalweekday.com/2020/07/09/entrepreneur-jd-rex-reveals-his-secrets-to-success-in-business/ (last visited Feb. 1, 2022)), and apparently owns at least one Richard Mille watch ("How This Entrepreneur Is Helping People Generate Passive Income," *available at* https://www.influencive.com/how-this-entrepreneur-is-helping-people-generate-passive-income/ (last visited Feb. 1, 2022)); *see also* https://wristadvisor.com/how-much-is-a-richard-mille-complete-pricing-guide/ (valuing Richard Mille watches between $60,000 - $1,300,000) (last visited Feb. 1, 2022).

66.     While on the boat on February 14, 2021, Dominguez also represented to the Individual Plaintiffs that he was about to implement his new algorithm, which would increase sales and profits for the Schreihans Stores and the Digital Stores owned by the Business Plaintiffs' referrals.

67.     As a result of their Florida meeting with Dominguez in February 2021, Plaintiffs believed that Dominguez was running a legitimate operation that only needed better management,

logistical, and operational support to fix its problems, and to satisfy or exceed the financial representations Defendants made to Plaintiffs.

68.     By February 2021, Vestige and Dominguez had failed to open Digital Stores for certain of the Business Plaintiffs' referrals. At the same time, the Schreihans Stores continued to be plagued by operational difficulties, suspensions by Amazon and Walmart, and lack of sales.

69.     In February 2021, Dominguez told Schreihans that he was hiring more staff to improve customer service for the owners of the Digital Stores managed by Vestige.

70.     In February 2021, Dominguez sent screen shots of information to Schreihans purporting to show that he was actively opening Digital Stores for the Business Plaintiffs' referrals.

71.     In March 2021, Dominguez represented to Schreihans that he was launching a new customer service system to improve operations and sales reporting services to Store Owners.

72.     By April 2021, Defendants had not opened all of the Schreihans Stores that had been paid for. Dominguez told Plaintiffs that he was having difficulty opening stores due to computer errors. At the same time, however, Dominguez asked Schreihans to become part owner of a yacht he wanted to purchase using the fees and commissions Vestige was receiving by managing Digital Stores.

73.     By April 2021, Schreihans was actively seeking personal assistants for Dominguez to help him run Vestige and to provide customer service support for the Business Plaintiffs' referrals.

74.     In April 2021, Schreihans and her operations manager traveled to Miami to meet with Dominguez a second time to evaluate his operations and to determine if they could provide the operational and logistical support Vestige claimed to need.

75.     On April 8, 2021, Dominguez hosted a lavish party on his yacht for Schreihans and her operations manager, for other Referral Sources, and for potential Store Owners who were considering using Vestige to open and manage their Digital Stores.

76.     On April 9 and 10, 2021, Schreihans and her operations manager attempted to conduct business meetings with Dominguez to resolve ongoing issues, to reconcile books and records, and to ensure that all Digital Stores related to Plaintiffs had been opened and were reporting sales revenue.

77.     Throughout April and May 2021, Defendants had failed to open as many as 60 Digital Stores for the Business Plaintiffs' referrals. At the same time, in April and May 2021, several of the Schreihans Stores had not been opened and/or had been suspended. For example, the Walmart stores Plaintiffs had paid for months earlier still had not been opened.

78.     In April and May 2021, Plaintiffs continued to believe that Vestige was a legitimate operation, that its problems were logistical and operational, and were caused by the enormous demand for its services.

79.     In April and May 2021, Plaintiffs continued to believe that the new algorithm Dominguez claimed to have developed would generate large profits for Plaintiffs and for the Business Plaintiffs' referrals.

80.     In early June 2021, Schreihans and her assistant traveled to Miami to meet with Dominguez for the third time. Schreihans intended to use the June 2021 meeting to confirm that Dominguez was actively working to solve his logistical and operational problems, and that all Digital Stores purchased by the Business Plaintiffs' referrals had been opened and were generating sales.

81.     In early June 2021, Dominguez told Schreihans that he was transferring the Digital Stores' accounts to a new customer service system that would finally fix his logistical and operational problems, and that sales and profits would then soar for Store Owners, including for the Business Plaintiffs' referrals.

82.     In June 2021, Dominguez sent Schreihans screen shots of information purporting to show that the new customer service system was working as he had represented to Schreihans.

83.     On June 9, 2021, Dominguez told Schreihans that she could own a "mega" Digital

Store for a payment of $100,000 to Vestige. At the same time, Dominguez told Schreihans that his new algorithm was generating increased sales and revenues for the Digital Stores that Vestige was managing.

84.     On June 9, 2021, Schreihans wired $100,000 to Dominguez to own the mega Digital Store Vestige would manage using its new algorithm and customer service system.

85.     In June 2021, Plaintiffs continued to experience operational, reporting, and logistical issues with the Digital Stores they had purchased, and with the Digital Stores the Business Plaintiffs' referrals had purchased.

86.     In about late June 2021, Defendants abruptly began to cease communicating with Plaintiffs.

87.     In late June and early July 2021, Plaintiffs demanded that Defendants return the Initial Fee payments Plaintiffs had made (the "Direct Payments") and to return the Pass Through Payments the Business Plaintiffs' referrals had made.

88.     Between November 2020 and March 2021, YTC made approximately 30 referrals to Defendants.

89.     From about March to August 2021, Frenchans made approximately 130 referrals to Defendants.

90.     On account of the Business Plaintiffs' referrals to Vestige, about 160 Digital Stores were paid for and were to be opened and managed by Vestige, through Dominguez.

91.     The Sub-Management Contract between the Business Plaintiffs and their referrals was an exact copy of the Management Contract between Vestige and Store Owners. An exemplar of the Sub-Management Contract is attached hereto as **Exhibit 3**.

92.     The Sub-Management Contract obligated the Business Plaintiffs to undertake the same obligations Vestige had agreed to perform under the Management Contracts and Schreihans Contracts.

93.     The Sub-Management Contracts between the Business Plaintiffs and their referrals

1  required the referrals to pay the Initial Fee, which Plaintiffs then sent to Defendants via the Pass
2  Through Transfers.

3         94.    Defendants accepted the Pass Through Transfers with the understanding that
4  Vestige would manage the Digital Stores for the Business Plaintiffs' referrals as they had agreed
5  to do under the Management Contracts and Schreihans Contracts.

6         95.    Defendants accepted the Pass Through Transfers with the understanding that
7  Plaintiffs' referrals would become Vestige's clients with the same rights and benefits the Store
8  Owners had under the Management Contracts, and with the same rights Plaintiffs had under the
9  Schreihans Contracts.

10         96.    Pursuant to the combined terms of the Sub-Management Contract and Referral
11  Contract, Plaintiffs acted solely as an intermediary between their referrals and Vestige.

12         97.    The Referral Contract required Vestige to pay the Business Plaintiffs a referral fee
13  ("Referral Fee") for each referral that paid the Initial Fee.

14         98.    The Referral Contract authorized the Business Plaintiffs to collect the Referral Fee
15  directly from each referral. The Referral Fee was between $5,000 and $7,000, but could exceed
16  $7,000 if the referral desired to own a "mega" Digital Store, or desired to purchase/open multiple
17  Digital Stores.

18         99.    Between November 2020 and August 2021, the Business Plaintiffs entered into
19  about 150 Sub-Management Contracts with their referrals.

20         100.    Between November 2020 and August 2021, the Business Plaintiffs collected Initial
21  Fees from their referrals of approximately $4,967,000.

22         101.    Between November 2020 and August 2021, the Business Plaintiffs made Pass
23  Through Payments to Defendants of about $4,216,000.

24         102.    The Pass Through Payments were passed through to Defendants in exchange for
25  Vestige's agreement to manage Digital Stores for the Business Plaintiffs' referrals according to
26  the terms of the Management Contract.

103.   Vestige failed to manage the Digital Stores for the Business Plaintiffs' referrals under the terms of the Management Contract.

104.   Defendants intentionally misrepresented to Plaintiffs their ability to manage Digital Stores for profit.

105.   Defendants intentionally misrepresented to Plaintiffs their ability to perform the Schreihans Contracts and Referral Contract.

106.   The Digital Store management business Defendants claimed to own and operate was a sham and a fraudulent scheme intended to defraud Plaintiffs and the Business Plaintiffs' referrals.

107.   Among other things, the Referral Contract provides that

In the event of a dispute between Company and Affiliate that cannot be resolved amicably, Affiliate agrees to binding arbitration in Arizona, in the United States. If for any reason any dispute is not resolved in arbitration, the dispute will be litigation in the court of Arizona, in the United States.

*See* Ex. 2 ¶ XII.

108.   By no later than November 2021, Vestige breached the Management Contracts, the Schreihans Contracts, and the Referral Contracts (collectively, the "Contracts").

109.   In November and December 2021, Plaintiffs made written demand upon Defendants to comply with the Contracts and to cure all defaults thereunder. *See* **Exs. 4** through **6**, attached hereto.

110.   As of date this Complaint, Defendants have failed and refused to respond to Plaintiffs' demands or cure Defendants' defaults under the Contracts.

## COUNT ONE

### (Breach of the Schreihans Contracts – Vestige)

111.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

112.   Schreihans entered into the Schreihans Contracts with Vestige.

113.   Pursuant to the Schreihans Contracts, Direct Payments of $182,000 were paid to Vestige.

114.   Schreihans paid the Direct Payments in exchange for Vestige's agreement to open and manage the Schreihans Stores.

115.   The Direct Payments were paid to Vestige in exchange for Vestige's agreement to manage the Schreihans Stores at a profit.

116.   The Direct Payments were paid to Vestige in exchange for Vestige's agreement to manage the Schreihans Stores in accordance with the Policies of Amazon and Walmart.

117.   Vestige breached the Schreihans Contracts by, among other things, failing to open and manage the Schreihans Stores as Defendants had agreed to do under the Schreihans Contracts.

118.   Plaintiffs have been damaged by Vestige's conduct.

119.   On account of Vestige's conduct, Plaintiffs are entitled to their lost profits.

120.   As a direct and proximate result of Vestige's breach of the Schreihans Contracts, Plaintiffs have been damaged in an amount to be proven at trial, but in no event less than $182,000, plus all accrued and accruing interest, penalties, attorneys' fees, and costs.

121.   This claim arises out of contract. Therefore, Plaintiffs are entitled to seek recovery of their reasonable attorneys' fees and costs pursuant the Schreihans Contracts, A.R.S. §§ 12-341, and 12-341.01, as applicable.

## COUNT TWO

### (Breach of the Referral Contracts – Vestige)

122.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

123.   The Business Plaintiffs entered into Referral Contracts with Vestige.

124.   Pursuant to the Referral Contracts, the Business Plaintiffs agreed to make referrals of potential Store Owners to Defendants for Vestige to manage.

125.   Pursuant to the Referral Contracts, the Business Plaintiffs collected Initial Fees from

their referrals and then made the Pass Through Payments to Defendants.

126.   Pursuant to the Referral Contracts, Vestige agreed to manage the Digital Stores for the Business Plaintiffs' referrals by providing the services Vestige was to provide for Store Owners under the Management Contracts, and for Plaintiffs under the Schreihans Contracts.

127.   At all times, Plaintiffs desired to protect the financial interests of the Business Plaintiffs' referrals. Consequently, Plaintiffs would not have entered into the Sub-Management Contracts with the referrals without Vestige having entered into the Referral Contracts.

128.   Plaintiffs would not have entered into the Sub-Management Contracts without assurances from Vestige that it would perform the services described in the Management Contracts for the financial benefit of the Business Plaintiffs' referrals.

129.   Vestige materially breached the Referral Contracts by failing to perform the services for the Business Plaintiffs' referrals as Vestige had agreed to perform.

130.   Vestige failed to open and manage the Digital Stores for the Business Plaintiffs' referrals, and many of the Digital Stores that had been opened were suspended and/or failed to achieve sales as Defendants had promised.

131.   Vestige failed to manage the Digital Stores for the Business Plaintiffs' referrals in accordance with the Policies of Amazon and Walmart.

132.   Vestige failed to manage the Digital Stores for the Business Plaintiffs' referrals using the unique algorithms Defendants claimed to have developed for that purpose.

133.   As a direct and proximate result of Vestige's breach of the Referral Contracts, Plaintiffs have been damaged in an amount to be proven at trial, plus all accrued and accruing interest, penalties, attorneys' fees, and costs.

134.   This claim arises out of contract. Therefore, Plaintiffs are entitled to seek recovery of their reasonable attorneys' fees and costs pursuant to the Referral Contracts, A.R.S. §§ 12-341, and 12-341.01, as applicable.

**COUNT THREE**

**(Indemnification – All Defendants)**

135.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

136.   The Business Plaintiffs entered into Referral Contracts with Vestige.

137.   At all times, Plaintiffs desired to act in the best interests of the Business Plaintiffs' referrals and to protect their financial interests.

138.   Pursuant to the Referral Contracts, the Business Plaintiffs agreed to refer potential Store Owners to Vestige to open Digital Stores for Vestige to manage because Plaintiffs believed their referrals would receive material financial benefits by doing so.

139.   Business Plaintiffs agreed to become Referral Sources so that their friends, business colleagues, and clients could take advantage of the business opportunities that the Business Plaintiffs had been offered.

140.   Pursuant to the Referral Contracts, the Business Plaintiffs collected Initial Fees from their referrals, which formed the Pass Through Payments to Defendants.

141.   Pursuant to the Referral Contracts, Vestige agreed to manage the Digital Stores for the Business Plaintiffs' referrals by performing the services required of Vestige under the Management Contracts, and required of Vestige under the Schreihans Contracts.

142.   Plaintiffs would not have entered into the Sub-Management Contracts and would not have made the Pass Through Payments without Defendants having entered into the Referral Contracts.

143.   Plaintiffs would not have entered into the Sub-Management Contracts without assurances from Defendants that the Business Plaintiffs' referrals would have the same rights of clients and Store Owners under the Management Contracts, and would have the same rights Plaintiffs had under the Schreihans Contracts.

144.   Plaintiffs would not have entered into the Sub-Management Contracts without

assurances from Defendants that their referrals would make a profit on their Digital Stores.

145.    Vestige materially breached the Referral Contracts by, among things, failing to perform the services required of it under the Management Contracts for the benefit of the Business Plaintiffs' referrals.

146.    The Business Plaintiffs' referrals that entered into Sub-Management Contracts have made demand upon Plaintiffs for a refund of their Initial Fees payments that were passed through to Defendants.

147.    The Business Plaintiffs' referrals that entered into the Sub-Management Contracts have made demand upon Plaintiffs for lost profits and other damages caused by Vestige's breach of the Referral Contracts and Management Contracts.

148.    The Business Plaintiffs desire to make their referrals financially whole and to compensate them for their losses.

149.    Defendants are required to fully indemnify Plaintiffs for any and all obligations, liabilities, and damages they incur to the Business Plaintiffs' referrals including, but not limited to, attorneys' fees and costs.

150.    This claim arises out of contract. Therefore, Plaintiffs are entitled to seek recovery of their reasonable attorneys' fees and costs pursuant to the Referral Contracts, A.R.S. §§ 12-341, and 12-341.01, as applicable.

## COUNT FOUR

### (Fraud – All Defendants)

151.    Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

152.    Defendants represented to Plaintiffs that Defendants had the expertise to successfully and profitably open and manage Digital Stores.

153.    Defendants represented to Plaintiffs that they had developed a unique algorithm that would cause the Digital Stores they managed to operate profitability.

154.   Defendants represented to Plaintiffs that they had developed a new algorithm that would make Digital Stores operated by Vestige even more profitable for Plaintiffs and for the referrals that the Business Plaintiffs made to Vestige.

155.   Defendants represented to Plaintiffs that their Digital Stores would be profitable and that the Digital Stores owned by the Business Plaintiffs' referrals would be profitable.

156.   Defendants represented to Plaintiffs that they would manage and operate the Digital Stores in accordance with the Policies of Amazon and Walmart, and would promptly cure any defect or violation of the Policies.

157.   Defendants represented to Plaintiffs that Vestige would faithfully perform all of the obligations arising under the Contracts.

158.   Defendants represented to Plaintiffs that Vestige was managing over 800 Digital Stores that had $30 million in sales.

159.   Defendants represented to Plaintiffs that Plaintiffs would earn passive income by owning Digital Stores and by making referrals of potential Store Owners and potential clients to Vestige.

160.   At all times, Plaintiffs desired to share the unique business opportunity they had been given with their friends, business colleagues, and clients that the Business Plaintiffs had referred to Vestige.

161.   Defendants' representations made to Plaintiffs were material and false.

162.   Defendants knew that the representations they made to Plaintiffs were false when they made them.

163.   Defendants knew that the representations they made to Plaintiffs would be relied upon by Plaintiffs to Plaintiffs' detriment and to the detriment of the Business Plaintiffs' referrals.

164.   Plaintiffs' reliance on the representations described above was reasonable under the circumstances.

165.   Defendants accepted Direct Payments and Pass Through Payments from Plaintiffs

without any intention to perform the services described in the Contracts.

166.   Defendants' representations made to Plaintiffs were material misrepresentations that fraudulently induced Plaintiffs to make Direct Payments to Defendants of at least $182,000.

167.   Defendants' representations made to Plaintiffs were material misrepresentations that fraudulently induced the Business Plaintiffs to enter into Sub-Management Contracts with their referrals.

168.   Defendants' representations made to Plaintiffs were material misrepresentations that fraudulently induced Plaintiffs to make Pass Through Payments to Vestige totaling over $4.9 million.

169.   Defendants' representations made to Plaintiffs were intentionally and deliberately deceptive and fraudulent.

170.   As a direct and proximate result of Defendants' fraudulent conduct, Plaintiffs have been damaged in an amount to be proven at trial, plus all accrued and accruing interest, penalties, and attorneys' fees and costs.

171.   Defendants' fraud was committed with an evil mind such that Plaintiffs are entitled to an award of punitive damages in an amount to be proven at trial.

172.   This claim arises out of contract. Therefore, Plaintiffs are entitled to seek recovery of their reasonable attorneys' fees and costs pursuant to the Contracts, A.R.S. §§ 12-341, and 12-341.01, as applicable.

## COUNT FIVE

### (Violation of Arizona's Consumer Fraud Statute, A.R.S. § 44-1521, *et seq.* - All Defendants)

173.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

174.   The Individual Defendants are natural persons within the meaning of A.R.S. § 44-1521.

175.   Defendants alleged to be in the business of managing Digital Stores.

176.   Defendants engaged in the business of selling "merchandise" within the meaning of A.R.S. § 44-1521.

177.   In connection with the sale of merchandise to Plaintiffs, Defendants engaged in deceptive acts and practices by falsely and fraudulently representing to have an expertise in managing Digital Stores.

178.   In connection with the sale of merchandise to Plaintiffs, Defendants engaged in deceptive acts and practices by falsely and fraudulently representing to have developed algorithms that would enable them to manage Digital Stores at a profit.

179.   In connection with the sale of merchandise to Plaintiffs, Defendants engaged in deceptive acts and practices by falsely and fraudulently representing to have specialized abilities to manage and operate Digital Stores in accordance with the Policies of Amazon and Walmart.

180.   In connection with the sale of merchandise to Plaintiffs, Defendants engaged in deceptive acts and practices by falsely and fraudulently representing that they would open and manage Digital Stores for the benefit of the Business Plaintiffs' referrals.

181.   Defendants intended that Plaintiffs rely on Defendants' deceptive acts and fraudulent practices.

182.   Plaintiffs reasonably relied on Defendants' deceptive acts and fraudulent practices by transferring over $5 million to Defendants.

183.   Defendants' conduct violated A.R.S. § 44-1521, *et seq.*

184.   Plaintiffs suffered damages as a result of Defendants' conduct.

185.   Defendants' conduct was the proximate and legal cause of the damages Plaintiffs have suffered.

186.   Defendants' conduct of engaging in deceptive and fraudulent practices was done with an evil mind.

187.   Plaintiffs are entitled to an award of compensatory and punitive damages against Defendants in amounts to be proven at trial.

**COUNT SIX**

**(Breach of Fiduciary Duty – All Defendants)**

188.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

189.   Defendants promised Plaintiffs that they would operate Plaintiffs' Digital Stores as an investment through which Plaintiffs would obtain substantial profits.

190.   Defendants encouraged Plaintiffs to invest in the Digital Stores for Defendants to manage.

191.   Defendants promised Plaintiffs that they would operate the Digital Stores as an investment for the Business Plaintiffs' referrals.

192.   Defendants encouraged the Business Plaintiffs to cause their referrals to invest in Digital Stores for Defendants to manage.

193.   Plaintiffs entrusted Defendants with their savings, assets, their business, and personal reputations.

194.   Plaintiffs entrusted Defendants with their referrals' savings and assets.

195.   Defendants occupied a position of trust with respect to Plaintiffs and the referrals and owed each of them fiduciary duties.

196.   Defendants breached their fiduciary duties to Plaintiffs with the intent to deceive and defraud Plaintiffs by falsely representing Defendants' intent to perform their obligations under the Contracts.

197.   Defendants breached their fiduciary duties to Plaintiffs with the intent to defraud Plaintiffs by falsely claiming to have developed unique algorithms that would produce profitable Digital Stores.

198.   Defendants breached their fiduciary duties to Plaintiffs with the intent to deceive and defraud Plaintiffs by falsely and fraudulently representing to have special expertise in operating Digital Stores according to the Policies of Amazon and Walmart.

199.   As a result Defendants' breach of their fiduciary duties owed to Plaintiffs, Plaintiffs have been injured and damaged. Plaintiffs are entitled to an award of compensatory and punitive damages against Defendants in amounts to be proven at trial.

## COUNT SEVEN

### (Conversion – All Defendants)

200.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

201.   Plaintiffs made Direct Payments and Pass Through Payments of not less than $5 million to Defendants for the specific purpose of managing and operating Digital Stores.

202.   Defendants asserted dominion and control of the funds Plaintiffs transferred to them and that had been earmarked for the purposes described in the Contracts.

203.   Defendants used the funds Plaintiffs transferred to them for Defendants' own purposes in contravention of Plaintiffs' rights and the Business Plaintiffs' referrals.

204.   Defendants are liable to Plaintiffs for conversion in an amount to be proven at trial but not less than $5 million.

## COUNT EIGHT

### (Accounting – All Defendants)

205.   Plaintiffs reallege and incorporate by reference the allegations set forth in each of the preceding paragraphs.

206.   Pursuant to the Schreihans Contracts, Plaintiffs made Direct Payments of at least $182,000 to Defendants.

207.   Defendants received the Direct Payments under fraudulent pretenses.

208.   Defendants received the Direct Payments and failed to use the transfers as required by the Schreihans Contracts.

209.   Defendants received the Pass Through Payments under false and fraudulent pretenses.

210.    Defendants did not use the Pass Through Payments in accordance with the Referral Contracts and Management Contracts.

211.    Plaintiffs have demanded that Defendants return the Direct Payments and Pass Through Payments of not less than $5 million.

212.    Defendants have failed to return the Direct Payments and Pass Through Payments.

213.    Defendants owed fiduciary duties to Plaintiffs and are required to account to Plaintiffs for all Direct Payments and Pass Through Payments.

214.    Plaintiffs are entitled to an accounting from Defendants.

WHEREFORE, Plaintiffs request the following relief:

1.    On Count One for breach of the Schreihans Contracts, compensatory damages in an amount to be proven at trial and an award of attorneys' fees and costs;

2.    On Count Two for breach of the Referral Contracts, compensatory damages in an amount to be proven at trial and an award of attorneys' fees and costs;

3.    On Count Three compensatory damages for Indemnification;

4.    On Count Four for Fraud, compensatory damages and punitive damages in amounts to be proven at trial;

5.    On Count Five for Consumer Fraud, compensatory and punitive damages in amounts to be proven at trial;

6.    On Count Six for Breach of Fiduciary Duty, compensatory damages and punitive damages in an amount to be proven at trial;

7.    On Count Seven for Conversion, compensatory damages in an amount to be proven at trial, or return of property transferred;

8.    On Count Eight for an accounting;

9.    On all Counts an award of prejudgment interest; and

10.    On all Counts, such other relief as is just and proper under the circumstances.

DATED this 14th day of  February, 2022.

MOYES SELLER & HENDRICKS LTD.

By */s/ Cody J. Jess*
    Cody J. Jess
    Scott R. Goldberg
    *Attorneys for Plaintiffs*

EXHIBIT 1

# Amazon E-Commerce Consulting Contract

## AMAZON E-COMMERCE CONSULTING AGREEMENT

**Vestige LLC**, a Florida limited liability company, whose address is 3303 Port Royale, Suite 708F, Fort Lauderdale, Florida, 33308 ("Consultant") and **Barbara Schreihans**, whose address is  10425 S. Painted Mare Dr., Vail, AZ 85641 ("Client"), hereby agree to the following terms and conditions regarding Consultant's proposal to create an online e-commerce store on the Amazon platform ("Store") for Client.

1.      **OFFER**

For valuable consideration received, as set forth herein, Consultant agrees to perform the following services for Client:

**a.      Product Research and Selection**.  Consultant will review, research and select products using its proprietary methods and databases. Consultant will, at its discretion, select products that, in Consultant's judgment, have a high probability of commercial success once placed into Client's Store and build said Store around the selection(s).

**b.      Store Implementation**.     Consultant will employ a team of individuals skilled in different aspects of e-commerce who will be responsible for creating and maintaining Client's store.  This team will be responsible for the Store's creation, including configuring the Amazon storefront, establishing the necessary relationships with suppliers, and configuring the front and back end systems necessary to implement the Store.

**c.      Customer Support.** Consultant will arrange and provide a Customer Support Team in support of Client's store. The Customer Support Team will be responsible for responding to all customers' phone and/or email inquiries without the need for Client's involvement. The team will exercise their best efforts to resolve all customer inquiries, handle product returns, and manage billing matters.

**d.      Ongoing Account Management.**   Consultant will maintain oversight of all Client stores and their performance. Consultant will make online tools available to Client which will permit Client to periodically monitor their Store's performance.

2

2.      **CLIENT RESPONSIBILITIES**

a.      **Long Term Business Venture.**      Client hereby accepts and understands that the subject Store is a long-term investment. While Consultant will exercise its best efforts to create and maintain the Store to perform quickly, Client understands and accepts that, like any new venture or investment, there is a "ramp up" period of approximately 2-4 months (or perhaps longer) in which sales and/or store performance may be slow, including a 4-8 week configuration period that begins once Client completes all of Client's ramp up steps (which steps include setting up accounts and a company through which Client will be conducting store business) during which time Consultant will be creating Client's store. Following this configuration period there is additional time that must pass as the Store gains traction within the Amazon environment in the form of search visibility and account integrity. Client accepts and understands that this ramp up period may not reflect that store's eventual profitability and agrees to fully and patiently cooperate with Consultant in making any adjustments to bring the Store to its full potential over a period of not less than one year.

b.      **Business Risk.**      Client hereby accepts and understands that e-commerce is an ever changing industry that is subject to many different types of business risk, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the marketability of Amazon products; (ii) macroeconomic changes that affect consumer spending, the emergence of recessions and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, to which Consultant and Client are bound alike, which may affect the marketability of Client's Store's products; (v) changes in international politics or economics, which may affect, among other things, the ability to package, distribute and/or ship Amazon products, and the costs thereof; (vi) market forces, including increased and/or changing levels of competition for any given product from other sellers of such product;  and (vii) unforeseen events, force majeure, and other external events that could affect the performance of any Amazon store. Client hereby agrees and understands that there are no guarantees as to the Store's profitability at any time and acknowledges that in case of deactivation of the store, Consultant will do all it can to recover the account and Client agrees to cooperate with all Consultant's needs in order to do so.

      **c.**      **Amazon Terms and Conditions.**  Client hereby agrees and understands that Consultant, Client and all Amazon stores are subject to all of Amazon's terms and conditions at all times. Consultant is bound to operate Client's store consistently with these terms and conditions, including in deciding which products to sell and how to sell them. Client hereby agrees and understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified. Consultant shall in the case of any such suspension exercise all reasonable efforts to return Client's store to operating status by referring the Client to a company that specializes in Amazon suspensions and appeals. Consultant makes no guarantees, however, that Amazon will in such cases return accounts to active status.

**3.**     **COMPENSATION**

      **a.**      Client shall pay to Consultant a one-time fee of Thirty-Five Thousand Dollars ($35,000) ("Fee") for Consultant's package of services as described herein via wire transfer or ACH to Consultant's account. See attached Addendum.

      **b.**      Client shall pay Consultant fifteen percent (15%) of the Store's profit every 1st day of the month until the Store's profit reaches $35,000.  After the Store's profit reaches $35,000, Client shall pay Consultant fifty percent (50%) of the Store's profit every 1st day of the month. Client shall continue to pay the ongoing commission for as long as the Store is in operation.

      **c.**      Consultant will bill Client on a monthly basis for the ongoing commission, as applicable, which Client shall have seventy-two (72) hours to remit payment to Consultant.

      **d.**      Consultant reserves the right to pause any store belonging to any Client for failure to pay any amount due within this period.

**4.**     **TERM**

      This Agreement shall be effective once both parties sign and date on the last page of this Agreement and shall continue in effect for a period of one (1) year. The parties may, but shall not be required to, continue the term of this Agreement for additional one (1) year periods by written agreement.

## 5.      TERMINATION

Consultant and Client reserve the right to terminate this Agreement for cause with fourteen (14) days written notice. For these purposes "cause" shall include, but not be limited to, any act or omission on **both** parts that makes the smooth operation of the Store successful, including by attempting to duplicate, replace or contravene any of the Consultant's efforts with respect to the Store, such that, in the Consultant's sole discretion, the Store cannot be successful in the face of such act(s) or omission(s). Consultant further reserves the right to pause the operation of any store belonging to any Client who violates the terms and conditions of this Agreement. In such cases Consultant may, in its discretion, reactivate the service for a Five Thousand Dollar ($5,000) reactivation fee.

## 6.      NON-DISPARAGEMENT

Client agrees and accepts that any issues or problems that Client could encounter with the Store, or Consultant's services, should be discussed in a professional and private manner. Client therefore hereby agrees never to disparage, insult, or fabricate information regarding Consultant in any online or offline forum whatsoever, including, but not limited to, social media channels, regardless of whether such comments or information would constitute libel or slander, and regardless of whether such comments could be deemed factually true or false. Client agrees that any such disparagement or insult constitutes a material breach of this Agreement, for which Consultant may pause or close Client's Store with no obligation to refund any amount whatsoever.

## 7.      SALES / USE TAX

Consultant does not provide tax reporting, tax management or accounting services of any kind. Client is responsible for determining if he, she or it is responsible for collecting and remitting sales or use tax and in which state. Client's reporting tools include data that the Client may review and download for sales / use tax reporting purposes, as applicable.

8.     **INTELLECTUAL PROPERTY**

Client agrees and understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product that can be ported, removed or installed in or on a different place or platform. Consultant grants no claim of right, title to or ownership in the Store, its trade name or trade dress, or any other intellectual property to Client or to any other entity or person under this Agreement.

9.     **NON-COMPETITION**

Client hereby agrees that he, she or it will not create or seek to create any Amazon store or service that in any way competes with the Store that Consultant shall create for Client, including, but not limited to, selling the same or substantially similar products, or using the Store trade name or trade dress, anywhere in the world, for the Term of this Agreement plus two (2) years which Client agrees is a reasonable limitation in time and scope. Client further agrees that it will not in any way, shape or form, offer to third parties services that are the same or substantially similar to Consultant's, including the ability or willingness to set up Amazon stores, services or sales channels, anywhere in the world, for the term of this Agreement plus two (2) years which Client agrees is a reasonable limitation in time and scope.

10.    **LIMITATION OF LIABILITY**

UNDER NO CIRCUMSTANCES WILL CONSULTANT OR ANY OF ITS THIRD-PARTY SERVICE PROVIDERS, PARENTS, AFFILIATES OR VENDORS, OR ANY OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS OF THE PARTIES, OR ITS PARENTS, AFFILIATES OR VENDORS, BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, HOWEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER IN TORT, INCLUDING NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 11.    DISCLAIMERS

CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY IN CONTRAVENTION OF THE FOREGOING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT UNDERSTANDS AND AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON- INFRINGEMENT, OR TITLE WITH RESPECT TO THE CONSULTANT SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

## 12.    GENERAL PROVISIONS

**a.    Non-Exclusivity.**    This Agreement shall not confer on either party any exclusive rights.  Each party is free to contract with others with respect to the subject matter of this Agreement.

**b.    Relationship of the Parties.**  The Parties hereto are engaged in the payment of a fee for services. No other relationship, including a joint venture, partnership or other formal affiliation, is intended.

**c.    Notices.**    All notices to either party shall be sent electronically to the email address(es) provided by each party to the other. All notices to Consultant shall be sent to johnny@vestige.llc with a written copy furnished to Consultant's address listed above, and to Client sent to barbara.schreihans@gmail.com with a written copy furnished to Client's address

listed above. Such written notice will be deemed given upon personal delivery, or three (3) days after the date of mailing if sent by certified or registered mail, or by a recognized private delivery service.

    **d.**    **Non-solicitation.**    Client shall not in any way endeavor to hire or contract with any member of Consultant's team(s), including, but not limited to, any individual with whom Client may have contact in the course of running Client's Store, nor shall Client in any way ever attempt to encourage any member of Consultant's team(s) to terminate their relationship with Consultant.

    **e.**    **Severability, Headings.**    In the event any provision of this Agreement is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect without being impaired or invalidated in any way. The parties agree to replace any invalid provision with a valid provision that most closely approximates the intent and economic effect of the invalid provision. Headings are used for convenience of reference only and in no way define, limit, construe or describe the scope or extent of any section, or in any way affect this Agreement.

    **f.**    **Dispute Resolution.** Any dispute or claim arising out of or relating to this Agreement will be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Ft. Lauderdale, FL, unless the parties mutually agree otherwise. This Agreement evidences a transaction in interstate commerce and this arbitration provision shall be interpreted and enforced in accordance with the Federal Arbitration Act and Federal Arbitration Law. An arbitrator may not award relief in excess of or contrary to what this Agreement provides, or order consolidation or arbitration on a class wide or representative basis, except that the arbitrator may award damages required by statute on an individual basis and may order injunctive or declaratory relief pursuant to an applicable Consumer Protection Statute. Any arbitration determination or award shall be confidential, and neither party may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement of the same. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses will be divided equally between the

parties, and each party will bear its own expenses of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration.

     **g.**    IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either party more than one (1) year after the cause of action arose.

     **h.**    **Amendment.**    Both parties acknowledge and agree that the internet and e-commerce industries evolve and change over time, and therefore agree that Consultant may modify this Agreement from time to time, ONLY to comply with any additional rules or policies that may be required under the laws of the United States or any other governing body. Consultant may from time to time provide to the other party modifications to or updated versions of this Agreement via electronic means. In such cases, the Client shall have thirty (30) days in which to accept said modifications or new version. Said modifications or new version shall be deemed to be rejected by Client if it either affirmatively rejects, or does not affirmatively accept, the same within such period of time, in which case this Agreement shall terminate with no further obligations due from Consultant or Client.

     **i.**    **Electronic Signatures.**    Under the Electronic Signatures in Global and National Commerce Act (E-Sign), this Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when (1) a party's electronic signature (which may be evidenced by either party clicking the "Submit," "Accept" or other equivalent indicator on the applicable website) is associated with this Agreement and related documents, (2) such Party consents and intends to be bound by this Agreement and related documents, and/or (3) the Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record). This Agreement and all related electronic documents shall be governed by the provisions of E-Sign. By pressing Submit, Accept or another equivalent indicator, such person or party agree as follows:

(i)  that this Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Agreement and related documents, and

(iii)  that said person or party has the ability to print or otherwise store the Agreement and related documents.

**j.**     **Governing Law, Jurisdiction, Conflicts of Law, Forum.**     This Agreement and performance thereof shall be interpreted construed and enforced in all respects in accordance with the laws of the State of Florida. Client hereby irrevocably consents to the personal jurisdiction of and venue in the state and federal courts located in Ft. Lauderdale, FL, with respect to any action, claim or proceeding arising out of or related to this Agreement and agrees not to commence or prosecute any such action, claim or proceeding other than in such courts. The parties hereto agree that Florida law shall apply regardless of any choice or conflicts of law principles. The parties further agree that Ft. Lauderdale, Florida is a convenient forum and waives any objection to the same under forum non-convenient principles.

**k.**     **Waiver.**     The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law will not be construed as a waiver or relinquishment of the right to assets or rely upon any such provision, right or remedy in that or any other instance. Waiver by either party of a breach of any provision contained herein must be in writing, and no such waiver may be construed as a waiver of any other and/or succeeding breach of such or any other provision of this Agreement, or a waiver of the provision itself.

**l.**     **Force Majeure.**     Neither party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation, acts of God, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies or interruptions in telecommunications or internet services, third party vendors or network provider services.

**m.**     **Merger.**     This Agreement constitutes the entire agreement between the parties and supersedes all prior memoranda or agreements relating thereto, whether oral or in writing.

**Acknowledgement.** The parties acknowledge that they have read and understand this Agreement and agree to be bound by its terms and conditions in their entirety.

This Agreement is duly executed by the duly authorized representatives of the parties as set forth below:

Consultant:

Vestige LLC

_____          _____
By: Johnny Dominguez                                      Date
Its: CEO

Client:

_____          _____
Barbara Schreihans                                          Date

**Addendum**

Wire Transfer Instructions

 Please use the below information to send Vestige LLC wire transfers.

Bank Information:     TD Bank

                      1175 S Federal Highway

                      Pompano Beach, FL, 33062

                      (954)-283-1091

Swift #:              NRTHUS33

ABA or Routing:       ███████

Credit to:            Vestige LLC

Account #:            ███████

Sending domestic wire transfers is easy and convenient. If you have any questions, please contact your Financial Center.

EXHIBIT 2

# PROFIT SHARING/REFERRAL AGREEMENT

This Profit Sharing/Referral Agreement ("Agreement") is between Frenchans, LLC, of 10425 S Painted Mare Dr, Vail AZ 85641 ("Frenchans") and Vestige LLC, of 3303 Port Royale, Suite 708F, Fort Lauderdale, Florida, 33308 ("Vestige"), effective as of December 21, 2020.

This Agreement encapsulates the terms of Vestige's recurring payments to Frenchans for Frenchans' referral of third party client services' business to Vestige in relation to the third party's Amazon stores ("Store").

## I.   TERM

This Agreement shall commence as of the date of signing of this Agreement by both parties and shall continue in perpetuity while the Store is in operation unless and until Frenchans terminates this Agreement ("Term"). Vestige's payment obligations, as dictated in this Agreement, commence upon the third party's receipt of its initial investment in the development of Store, the terms of which are described in the third party's contract with Frenchans' and incorporated herein by reference.

## II.   PAYMENT

Both parties agree that Vestige shall pay Frenchans 5% of all residual profits received by Stores, on a monthly basis, while the Stores are in operation.

Vestige shall pay Frenchans its ongoing residual fee, 5% of the Store's residual profits, within 2 weeks of third party clients payment, via PayPal. Vestige must pay Frenchans within 2 weeks after payment from the third party client.
If, after 14 business days, Vestige has still not satisfactorily paid Frenchans the amount due, Frenchans may pursue the collection of the outstanding balance to the fullest extent of the law, including, but not limited to, a debt collection agency.

Frenchans reserves the right to request and receive from Vestige at any time an itemized balance sheet of all Store profits generated to date.

## III.   CONFIDENTIALITY/NON-DISCLOSURE

At times, Vestige and Frenchans may exchange confidential information in relation to this Agreement. Both parties recognize the importance of confidentiality during the Term and agree to hold all confidential information exchanged in the strictest confidence and safeguard it from disclosure and misuse to the fullest extent possible. Confidential information includes (i) all information disclosed between parties reasonably considered to be confidential and proprietary, regardless of whether the parties labeled the information as confidential, given the circumstances surrounding the disclosure of the information and (ii) all information labeled or indicated to be confidential by one party to the other party to be confidential, provided that the information was not public at the time of disclosure, (collectively, "Confidential Information").

Both parties agree not to make use of any Confidential Information unless and until either party is required to disclose pursuant to a governmental order. If either party is required by law to disclose Confidential Information, the party required to disclose the Confidential Information must provide written notice to the other party of the disclosure as soon as is reasonably possible.

## IV.   WARRANTY

Both parties represent that they have full authority to enter into this Agreement and doing so will not infringe on the rights of any third parties.

## V.   NO TRANSFER OR ASSIGNMENT

Vestige cannot transfer its position in this Agreement without prior written approval from Frenchans.

## VI.   MODIFICATION

Both parties agree that this Agreement may only be modified upon mutual written agreement.

## VII.   INTERRUPTION OF STORE SERVICE

If, due to an interruption of the operation of Store due to factors outside of the control of Vestige that will impact Vestige's ability to promptly pay the amount due per month, Vestige will inform Frenchans as soon as is reasonably possible.

## VIII.   TERMINATION

If Vestige breaches this Agreement via non-payment or any other breach of this Agreement's terms, Frenchans may terminate this Agreement upon 14 days written notice to Vestige. If Frenchans terminates this Agreement, Vestige must pay Frenchans any outstanding referral payments due immediately, within 14 business days.

## IX.   RELATIONSHIP OF PARTIES

Both parties agree that this Agreement does not create a partnership, joint venture, agency or employment relationship.

## X.   LIMITATION OF LIABILITY

To the fullest extent allowed by law, Frenchans is not liable and does not accept responsibility for any losses or damages caused by or resulting from this Agreement. Vestige agrees that Frenchans is not liable for any direct, indirect, consequential, punitive, or any other damages,

arising out of its participation in this Agreement. Vestige agrees to this limitation of liability and releases Frenchans from any and all claims.

Both parties agree that neither party shall be liable to any third party for any damages resulting from the parties' participation in this Agreement, regardless of whether any damages are related to a party's negligence or breach of this Agreement.

XI.    INDEMNIFICATION

Both parties agree to indemnify and hold harmless the other party, and any parties working for or associated with the other party (including, but not limited to, employees, agents, contractors, subsidiaries, partners, affiliates, successors, assigns) from any and all actions, claims, damages, fees and expenses, including attorney's fees, arising out of this Agreement. Both parties agree that this indemnification provision will survive any termination of the Agreement.

XII.    GOVERNING LAW/DISPUTE RESOLUTION

In the event of a dispute between Company and Affiliate that cannot be resolved amicably, Affiliate agrees to binding arbitration in Arizona, in the United States.  If for any reason any dispute is not resolved in arbitration, the dispute will be litigated in the courts of Arizona, in the United States.

XIII.    ELECTRONIC SIGNATURES

Each party agrees that the electronic signatures, whether digital or encrypted, of the parties included in this Agreement are intended to authenticate this writing and to have the same force and effect as manual signatures. Delivery of a copy of this Agreement bearing an original or electronic signature by electronic mail in "portable document format" (".pdf") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, will have the same effect as physical delivery of the paper document bearing an original or electronic signature.

XIV.    WAIVER

The failure of either Vestige or Frenchans at any time to enforce any provision of the Agreement shall in no way affect its right thereafter to require complete performance by the other party and waiver of any breach of this Agreement shall not be held to be a waiver for any subsequent breaches.

XV.    SEVERABILITY

If any portion of this Agreement is deemed to be void or unenforceable, that portion is severable from the Agreement and does not impact the enforceability of the remainder of the Agreement.

## XVI.   ENTIRE AGREEMENT

This Agreement constitutes the entire agreement between Vestige and Frenchans with respect to referral payments due Frenchans. This Agreement supersedes any prior communications or agreements between the parties.

Vestige Representative Printed Name:

Johnny Fleming

04/9/2021

**Vestige Rep. Signature**        **Date**

Frenchans Representative Printed Name:

Barbara Schreckerst

4/9/2021

**Frenchans Rep. Signature**        **Date**

EXHIBIT 3

# Amazon E-Commerce

# Consulting Contract

<u>AMAZON E-COMMERCE CONSULTING AGREEMENT</u>

Frenchans, LLC an Arizona limited liability company, whose address is 10425 S Painted Mare Drive, Vail AZ 85641 ("Consultant") and _____,whose address is _____ ("Client"), hereby agree to the following terms and conditions regarding Consultant's proposal to create an online e-commerce store on the Amazon platform ("Store") for Client.

1. OFFER

For valuable consideration received, as set forth herein, Consultant agrees to perform the following services for Client:

a. Product Research and Selection. Consultant will review, research and select products using its proprietary methods and databases. Consultant will, at its discretion, select products that, in Consultant's judgment, have a high probability of commercial success once placed into Client's Store and build said Store around the selection(s).

b. Store Implementation. Consultant will employ a team of individuals skilled in different aspects of e-commerce who will be responsible for creating and maintaining Client's store. This team will be responsible for the Store's creation, including configuring the Amazon storefront, establishing the necessary relationships with suppliers, and configuring the front and back end systems necessary to implement the Store.

c. Customer Support. Consultant will arrange and provide a Customer Support Team in support of the Client's store. The Customer Support Team will be responsible for responding to all customers' phone and/or email inquiries without the need for Client's involvement. The team will exercise their best efforts to resolve all customer inquiries, handle product returns, and manage billing matters.

d. Ongoing Account Management. Consultant will maintain oversight of all Client stores and their performance. Consultant will make online tools available to Client which will permit Client to periodically monitor their Store's performance.

2. CLIENT RESPONSIBILITIES

 a. Long Term Business Venture. Client hereby accepts and understands that the subject Store is a long-term investment. While Consultant will exercise its best efforts to create and maintain the Store to perform quickly, Client understands and accepts that, like any new venture or investment, there is a "ramp up" period of approximately 2-4 months (or perhaps longer) in which sales and/or store performance may be slow, including a 4-8 week configuration period that begins once Client completes all of Client's ramp up steps (which steps include setting up accounts and a company through which Client will be conducting store business) during which time Consultant will be creating Client's store. Following this configuration period there is additional time that must pass as the Store gains traction within the Amazon environment in the form of search visibility and account integrity. Client accepts and understands that this ramp up period may not reflect that store's eventual profitability and agrees to fully and patiently cooperate with Consultant in making any adjustments to bring the Store to its full potential over a period of not less than one year.

       b. Business Risk. Client hereby accepts and understands that e-commerce is an ever changing industry that is subject to many different types of business risk, including but not limited to: (i) a changing legal environment in which regulations can emerge or change that affects the marketability of Amazon products; (ii) macroeconomic changes that affect consumer spending, the emergence of recessions and the like; (iii) changes in the popular appeal of and demand for different types of Amazon products; (iv) changes in Amazon's terms and conditions, to which Consultant and Client are bound alike, which may affect the marketability of Client's Store's products; (v) changes in international politics or economics, which may affect, among other things, the ability to package, distribute and/or ship Amazon products, and the costs thereof; (vi) market
forces, including increased and/or changing levels of competition for any given product from other sellers of such product; and (vii) unforeseen events, force majeure, and other external events that could affect the performance of any Amazon store. Client hereby agrees and understands that there are no guarantees as to the Store's profitability at any

time and acknowledges that in case of deactivation of the store, Consultant will do all it can to recover the account and Client agrees to cooperate with all Consultant's needs in order to do so.

c. Amazon Terms and Conditions. Client hereby agrees and understands that Consultant, Client and all Amazon stores are subject to all of Amazon's terms and conditions at all times. Consultant is bound to operate Client's store consistently with these terms and conditions, including in deciding which products to sell and how to sell them. Client hereby agrees and understands that Amazon, from time to time, with or without cause, can and does suspend accounts for various reasons, some of which may not be obvious or justified. Consultant shall in the case of any such suspension exercise all reasonable efforts to return Client's store to operating status by referring the Client to a company that specializes in Amazon suspensions and appeals. Consultant makes no guarantees, however, that Amazon will in such cases return accounts to active status.


3. COMPENSATION

a. Client shall pay to Consultant a one-time fee of Thirty-Seven Thousand Dollars ($37,000) ("Fee") for Consultant's package of services as described herein via wire transfer or ACH to Consultant's account. See attached Addendum.

b. Client shall pay Consultant fifty percent (50%) of the Store's profit every 1st day of the month. Client shall continue to pay the ongoing commission for as long as the Store is in operation.

c. Consultant will bill Client on a monthly basis for the ongoing commission, as applicable, which Client shall have seventy-two (72) hours to remit payment to Consultant.

d. Consultant reserves the right to pause any store belonging to any Client for failure to pay any amount due within this period.

4. TERM

This Agreement shall be effective once both parties sign and date on the last page of this Agreement and shall continue in effect for a period of one (1) year. The parties may,

but shall not be required to, continue the term of this Agreement for additional one (1) year periods by written agreement.

## 5. TERMINATION

Consultant and Client reserve the right to terminate this Agreement for cause with fourteen (14) days written notice. For these purposes "cause" shall include, but not be limited to, any act or omission on both parts that makes the smooth operation of the Store successful, including by attempting to duplicate, replace or contravene any of the Consultant's efforts with respect to the Store, such that, in the Consultant's sole discretion, the Store cannot be successful in the face of such act(s) or omission(s). Consultant further reserves the right to pause the operation of any store belonging to any Client who violates the terms and conditions of this Agreement. In such cases Consultant may, in its discretion, reactivate the service for a Five Thousand Dollar ($5,000) reactivation fee.

## 6. NON-DISPARAGEMENT

Client agrees and accepts that any issues or problems that Client could encounter with the Store, or Consultant's services, should be discussed in a professional and private manner. Client therefore hereby agrees never to disparage, insult, or fabricate information regarding Consultant in any online or offline forum whatsoever, including, but not limited to, social media channels, regardless of whether such comments or information would constitute libel or slander, and regardless of whether such comments could be deemed factually true or false. Client agrees that any such disparagement or insult constitutes a material breach of this Agreement, for which Consultant may pause or close Client's Store with no obligation to refund any amount whatsoever.

## 7. SALES / USE TAX

Consultant does not provide tax reporting, tax management or accounting services of any kind. Client is responsible for determining if he, she or it is responsible for collecting and remitting sales or use tax and in which state. Client's reporting tools include data that the Client may review and download for sales / use tax reporting purposes, as applicable.

8. INTELLECTUAL PROPERTY

Client agrees and understands that Client's Store is a service hosted on the Amazon platform and not a distinct or severable product that can be ported, removed or installed in or on a different place or platform. Consultant grants no claim of right, title to or ownership in the Store, its trade name or trade dress, or any other intellectual property to Client or to any other entity or person under this Agreement.

9. NON-COMPETITION

Client hereby agrees that he, she or it will not create or seek to create any Amazon store or service that in any way competes with the Store that Consultant shall create for Client, including, but not limited to, selling the same or substantially similar products, or using the Store trade name or trade dress, anywhere in the world, for the Term of this Agreement plus two (2) years which Client agrees is a reasonable limitation in time and scope. Client further agrees that it will not in any way, shape or form, offer to third parties services that are the same or substantially similar to Consultant's, including the ability or willingness to set up Amazon stores, services or sales channels, anywhere in the world, for the term of this Agreement plus two (2) years which Client agrees is a reasonable limitation in time and scope.

10. LIMITATION OF LIABILITY

UNDER NO CIRCUMSTANCES WILL CONSULTANT OR ANY OF ITS THIRD PARTY SERVICE PROVIDERS, PARENTS, AFFILIATES OR VENDORS, OR ANY OFFICERS, DIRECTORS, EMPLOYEES OR AGENTS OF THE PARTIES, OR ITS PARENTS, AFFILIATES OR VENDORS, BE LIABLE FOR ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL, SPECIAL OR EXEMPLARY DAMAGES, HOWEVER OR WHENEVER ARISING, INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOST REVENUE, LOST PROFITS, ANTICIPATED PROFITS, LOST BUSINESS OR INJURY TO BUSINESS REPUTATION, COST OF PROCUREMENT OF SUBSTITUTE SERVICES, UNDER ANY THEORY OF LIABILITY OR CAUSE OF ACTION WHETHER

IN TORT, INCLUDING NEGLIGENCE, CONTRACT OR OTHERWISE, REGARDLESS OF WHETHER OR NOT IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

11. DISCLAIMERS

CONSULTANT'S SERVICES ARE PROVIDED ON AN "AS IS" "AS AVAILABLE" BASIS WITHOUT ANY REPRESENTATIONS OR WARRANTIES. CLIENT MAY NOT RELY UPON ANY REPRESENTATION OR WARRANTY REGARDING CONSULTANT'S SERVICES MADE BY ANY THIRD PARTY IN CONTRAVENTION OF THE FOREGOING STATEMENTS, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS BY THIRD PARTY SERVICE PROVIDERS. CLIENT UNDERSTANDS AND AGREES THAT CONSULTANT SHALL BEAR NO RISK WHATSOEVER AS TO THE SALE OF PRODUCTS OR SERVICES. CONSULTANT SPECIFICALLY DISCLAIMS ANY AND ALL REPRESENTATIONS, WARRANTIES AND CONDITIONS, WHETHER EXPRESS OR IMPLIED, ARISING BY STATUTE, OPERATION OF LAW, USAGE OF TRADE, COURSE OF DEALING, OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OR CONDITIONS OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON INFRINGEMENT, OR TITLE WITH RESPECT TO THE CONSULTANT SERVICES, OR OTHER SERVICES OR GOODS PROVIDED UNDER THIS AGREEMENT.

12. GENERAL PROVISIONS

a. Non-Exclusivity. This Agreement shall not confer on either party any exclusive rights. Each party is free to contract with others with respect to the subject matter of this Agreement.

b. Relationship of the Parties. The Parties hereto are engaged in the payment of a fee for services. No other relationship, including a joint venture, partnership or other formal affiliation, is intended.

c. Notices. All notices to either party shall be sent electronically to the email address(es) provided by each party to the other. All notices to Consultant shall be sent to frenchans@gmail.com with a written copy furnished to Consultant's address listed above,

and to Client sent to _____with a written copy furnished to Client's address listed above. Such written notice will be deemed given upon personal delivery, or three (3) days after the date of mailing if sent by certified or registered mail, or by a recognized private delivery service.

     d. Non-solicitation. Client shall not in any way endeavor to hire or contract with any member of Consultant's team(s), including, but not limited to, any individual with whom Client may have contact in the course of running Client's Store, nor shall Client in any way ever attempt to encourage any member of Consultant's team(s) to terminate their relationship with Consultant.

     e. Severability, Headings. In the event any provision of this Agreement is held to be invalid or unenforceable for any reason, the remaining provisions will continue in full force and effect without being impaired or invalidated in any way. The parties agree to replace any invalid provision with a valid provision that most closely approximates the intent and economic effect of the invalid provision. Headings are used for convenience of reference only and in no way define, limit, construe or describe the scope or extent of any section, or in any way affect this Agreement.

     f. Dispute Resolution. Any dispute or claim arising out of or relating to this Agreement will be resolved by binding arbitration. The arbitration of any dispute or claim shall be conducted in accordance with the American Arbitration Association ("AAA") rules, as modified by this Agreement, which shall take place in Tucson, AZ, unless the parties mutually agree otherwise. This Agreement evidences a transaction in interstate commerce and this arbitration provision shall be interpreted and enforced in accordance with the Federal Arbitration Act and Federal Arbitration Law. An arbitrator may not award relief in excess of or contrary to what this Agreement provides, or order consolidation or arbitration on a class wide or representative basis, except that the arbitrator may award damages required by statute on an individual basis and may order injunctive or declaratory relief pursuant to an applicable Consumer Protection Statute. Any arbitration determination or award shall be confidential, and neither party may disclose the existence, content or results of any arbitration, except as may be required by law or for

purposes of enforcement of the same. Judgment on any arbitration award may be entered in any court having proper jurisdiction. All administrative fees and expenses will be divided equally between the parties, and each party will bear its own expenses of counsel, experts, witnesses and preparation and presentation of evidence at the arbitration.

g. IF FOR ANY REASON THIS ARBITRATION CLAUSE IS DEEMED INAPPLICABLE OR INVALID, THE PARTIES FOREVER AND WITHOUT EXCEPTION WAIVE, TO THE FULLEST EXTENT ALLOWED BY LAW, ANY RIGHT TO PURSUE ANY CLAIMS ON A CLASS OR CONSOLIDATED BASIS OR IN A REPRESENTATIVE CAPACITY. No action, regardless of form, arising out of or in conjunction with the subject matter of this Agreement may be brought by either party more than one (1) year after the cause of action arose.

h. Amendment. Both parties acknowledge and agree that the internet and e commerce industries evolve and change over time, and therefore agree that Consultant may modify this Agreement from time to time, ONLY to comply with any additional rules or policies that may be required under the laws of the United States or any other governing body. Consultant may from time to time provide to the other party modifications to or updated versions of this Agreement via electronic means. In such cases, the Client shall have thirty (30) days in which to accept said modifications or new version. Said modifications or new version shall be deemed to be rejected by Client if it either affirmatively rejects, or does not affirmatively accept, the same within such period of time, in which case this Agreement shall terminate with no further obligations due from Consultant or Client.

i. Electronic Signatures. Under the Electronic Signatures in Global and National Commerce Act (E-Sign), this Agreement and all electronically executed documents related hereto are legally binding in the same manner as are hard copy documents executed by hand signature when (1) a party's electronic signature (which may be evidenced by either party clicking the "Submit," "Accept" or other equivalent indicator on the applicable website) is associated with this Agreement and related documents, (2)

such Party consents and intends to be bound by this Agreement and related documents, and/or (3) the Agreement is delivered in an electronic record capable of retention by the recipient at the time of receipt (i.e., print or otherwise store the electronic record). This Agreement and all related electronic documents shall be governed by the provisions of E-Sign. By pressing Submit, Accept or another equivalent indicator, such person or party agree as follows:

> (i) that this Agreement and related documents shall be effective by electronic means, (ii) to be bound by the terms and conditions of this Agreement and related documents, and

> (iii) that said person or party has the ability to print or otherwise store the Agreement and related documents.

j. Governing Law, Jurisdiction, Conflicts of Law, Forum. This Agreement and performance thereof shall be interpreted, construed and enforced in all respects in accordance with the laws of the State of Arizona. Client hereby irrevocably consents to the personal jurisdiction of and venue in the state and federal courts located in Tucson, AZ, with respect to any action, claim or proceeding arising out of or related to this Agreement and agrees not to commence or prosecute any such action, claim or proceeding other than in such courts. The parties hereto agree that Arizona law shall apply regardless of any choice or conflicts of law principles. The parties further agree that Tucson, AZ is a convenient forum and waives any objection to the same under forum non-convenient principles.

k. Waiver. The failure of any party to insist on or enforce strict performance of any provision of this Agreement, or to exercise any right or remedy under this Agreement or applicable law will not be construed as a waiver or relinquishment of the right to assets or rely upon any such provision, right or remedy in that or any other instance. Waiver by either party of a breach of any provision contained herein must be in writing, and no such waiver may be construed as a waiver of any other and/or succeeding breach of such or any other provision of this Agreement, or a waiver of the provision itself.

l. Force Majeure. Neither party shall be responsible for any failure to perform beyond its reasonable control, including, without limitation, acts of God, acts or omissions of civil or military authority, civil disturbances, wars, strikes or other labor disputes, fires, transportation contingencies or interruptions in telecommunications or internet services, third party vendors or network provider services.

m. Merger. This Agreement constitutes the entire agreement between the parties and supersedes all prior memoranda or agreements relating thereto, whether oral or in writing.

Acknowledgement. The parties acknowledge that they have read and understand this Agreement and agree to be bound by its terms and conditions in their entirety.

This Agreement is duly executed by the duly authorized representatives of the parties as set forth below:

Consultant:

Frenchans LLC

_____ _____

By: Barbara Schreihans
CEO

Client:

_____ _____

By: Date

Addendum
                              Wire Transfer Instructions

Please use the below information to send Frenchans, LLC wire transfers.

Bank Information: Chase

   270 Park Avenue

   New York, New York 10017

Swift #: CHASUS33

ABA or Routing: ██████

Credit to: Frenchans, LLC

Account #: ██████

Sending domestic wire transfers is easy and convenient. If you have any questions, please contact your Financial Center.

EXHIBIT 4



**CODY J. JESS**

1850 N. Central Avenue, Suite 1100 ● Phoenix, AZ 85004

📞 (602) 604-2194        ✉ cjess@law-msh.com

November 19, 2021

**VIA CERTIFIED MAIL AND EMAIL**

Vestige LLC
c/o Johnny Dominguez
3303 Port Royale, Suite 708F
Fort Lauderdale, Florida 33308
johnny@vestige.llc

Re:     **Profit Sharing/Referral Agreement Between Vestige LLC and Frenchans LLC effective as of December 21, 2020 (the "Agreement")**

Mr. Dominguez:

Please be advised that this law firm represents Frenchans LLC, Your Tax Coach, LLC, Matt French, and Barbara Schreihans (collectively, the "Frenchans Parties"). Pursuant to the Agreement, the Frenchans Parties agreed to refer clients ("Clients") to Vestige, LLC  to open and manage stores ("Stores") on the Amazon platform on the Clients' behalf. The Clients the Frenchans Parties referred to Vestige paid Vestige substantial sums in advance for its services. To date, many of the Clients have not received from Vestige the services they bargained for. In many cases, Vestige has not opened Stores for the Clients and/or has not managed the Stores according to agreed upon terms. Several Clients have had their Stores suspended and their funds frozen by Amazon. Many of the Clients are seeking reimbursement and compensation from the Frenchans Parties as a result.

The Frenchans Parties consider Vestige's conduct to be a material breach of the Agreement, entitling the Frenchans Parties to damages and to indemnification under Paragraph XI of the Agreement. The Agreement provides:

In the event of a dispute between the Company and the Affiliate that cannot be resolved amicably, Affiliate agrees to binding arbitration in Arizona, in the United States. If for any reason any dispute is not resolved in arbitration, the dispute will be litigated in the Courts of Arizona, in the United States.

Agreement ¶ XII.

Previous attempts to resolve this matter amicably have been unsuccessful. Accordingly, pursuant to Paragraph XII of the Agreement, the Frenchans Parties demand that Vestige enter into non-binding mediation in Arizona to resolve the disputes described above. The Frenchans Parties request that Vestige respond to this demand no later than **December 3, 2021**. If a timely response is not received, then the Frenchans Parties will commence litigation against Vestige and others in the United States District Court for the State Arizona. I am available to discuss this matter with you at your convenience.

Sincerely,

Cody J. Jess

CJJ/jsl

EXHIBIT 5



CODY J. JESS
1850 N. Central Avenue, Suite 1100 • Phoenix, AZ 85004
📞 (602) 604-2194          ✉ cjess@law-msh.com

December 7, 2021

**VIA CERTIFIED AND FIRST CLASS MAIL**

Vestige LLC
c/o Johnny Dominguez
1300 Brickell Drive
Fort Lauderdale, Florida 33301

**Re:    Profit Sharing/Referral Agreement Between Vestige LLC and Frenchans LLC effective as of December 21, 2020 (the "Agreement")**

Mr. Dominguez:

Please be advised that this law firm represents Frenchans LLC, Your Tax Coach, LLC, Matt French, and Barbara Schreihans (collectively, the "Frenchans Parties"). Pursuant to the Agreement, the Frenchans Parties agreed to refer clients ("Clients") to Vestige, LLC to open and manage stores ("Stores") on the Amazon platform on the Clients' behalf. The Clients the Frenchans Parties referred to Vestige paid Vestige substantial sums in advance for its services. To date, many of the Clients have not received from Vestige the services they bargained for. In many cases, Vestige has not opened Stores for the Clients and/or has not managed the Stores according to agreed upon terms. Several Clients have had their Stores suspended and their funds frozen by Amazon. Many of the Clients are seeking reimbursement and compensation from the Frenchans Parties as a result.

The Frenchans Parties consider Vestige's conduct to be a material breach of the Agreement, entitling the Frenchans Parties to damages and to indemnification under Paragraph XI of the Agreement. The Agreement provides:

In the event of a dispute between the Company and the Affiliate that cannot be resolved amicably, Affiliate agrees to binding arbitration in Arizona, in the United States. If for any reason any dispute is not resolved in arbitration, the dispute will be litigated in the Courts of Arizona, in the United States.

Agreement ¶ XII.

Previous attempts to resolve this matter amicably have been unsuccessful. Accordingly, pursuant to Paragraph XII of the Agreement, the Frenchans Parties demand that Vestige enter into non-binding mediation in Arizona to resolve the disputes described above. The Frenchans Parties request that Vestige respond to this demand no later than **December 21, 2021**. If a timely response is not received, then the Frenchans Parties will commence litigation against Vestige and others in the United States District Court for the State Arizona. I am available to discuss this matter with you at your convenience.

Sincerely,

Cody J. Jess

CJJ/jsl

00299307

# EXHIBIT 6

| | |
|---|---|
| **From:** | Cody Jess |
| **To:** | jd.vestige@gmail.com |
| **Cc:** | tiffany.vestige@gmail.com; blake.vestige@gmail.com; Julie Larsen |
| **Subject:** | Frenchans, LLC, et al. v. Vestige, LLC, et al. - Demand [FINAL ATTEMPT] |
| **Date:** | Tuesday, December 21, 2021 3:14:30 PM |
| **Attachments:** | 2021.12.07 Demand Letter to Vestige (2nd attempt) (00299309xC6CC6).PDF |
| | image001.png |
| | image002.png |
| **Importance:** | High |

Mr. Dominguez,

Please see the attached letter, which has been sent to you previously via regular mail.  If I do not receive a response from you by <u>December 28, 2021</u>, Frenchans, LLC and others will file a lawsuit against, among other persons and entities, Vestige, LLC and you in the United States District Court for the District of Arizona.  Your prompt attention to this matter is strongly encouraged.

Best,



**Cody James Jess**
**Shareholder**

**1850 N. Central Avenue, Suite 1100**
**Phoenix, Arizona 85004-4541**
**Office  (602) 604-2194**
**www.law-msh.com**



NOTE:  The information in this e-mail is confidential and may be legally privileged.  If you are not the intended recipient, you must not read, use or disseminate the information.  Further, if you are not the intended recipient of this e-mail, please delete it immediately.  This e-mail and its attachments are believed to be free of any virus or other defect; however, it is the responsibility of the recipient to ensure that the e-mail is virus free and no responsibility is accepted by Moyes Sellers & Hendricks for any loss or damage arising in any way from the use of the e-mail or attachments thereto.